**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

REP. ANDRE E. CUSHING III, et al., )
)
Plaintiffs, )
)
v. ) Docket no. 1:10-cv-330-GZS
)
WALTER F. MCKEE, et al., )
)
Defendants. )
)
______________________________________)

**ORDER ON MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

Before the Court are Plaintiffs' Motion for Temporary Restraining Order ("TRO") (Docket # 22) and Motion for Preliminary Injunction ("PI") (Docket # 4). Defendants responded to both Motions in a joint Opposition filed on September 10, 2010 ("Joint Opp'n") (Docket # 28), to which Plaintiffs replied, in two separate but related briefs, on September 13, 2010 (Docket #s 29 & 30). Having considered all of the written submissions made in connection with these Motions—including these filings, Plaintiffs' Verified Complaint for Injunctive and Declaratory Relief ("Compl.") (Docket # 1) and the declaration/affidavits submitted by both parties (Cushing Decl. & Supp. Exs. (Docket #s 22-1 to 22-3); Affs. of MCEA Candidates (Docket #s 28-1 to 28-6); Wayne Aff. & Supp. Exs. (Docket # 28-7 to 28-15))—the Court hereby DENIES the Motion for Temporary Restraining Order and RESERVES RULING on the Motion for Preliminary Injunction.

## I. STANDARD OF REVIEW

The extraordinary remedy of a TRO is available under Federal Rule of Civil Procedure 65 only to a litigant facing a threat of irreparable harm "before the adverse party can be heard in

opposition." See Fed. R. Civ. P. 65(b)(1). When, as here, the opposing party has had both notice and an opportunity to respond, "the standards for issuing a TRO are substantively similar to those for a preliminary injunction." Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc., 564 F. Supp. 2d 63, 66 (D. Me. 2008) (citing 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2951 (1995 & Supp. 2008)); see also, e.g., Michalowski v. Head, No. CV-10-278-B-W, 2010 WL 2757359, at *2 (D. Me. July 12, 2010). Plaintiffs, as the moving party, bear the burden of persuasion to show: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Iantosca v. Step Plan Servs., Inc., 604 F.3d 24, 29 n.5 (1st Cir. 2010) (citation omitted).

## II. STATUTORY AND FACTUAL BACKGROUND

### A. Maine Campaign Finance Law & the Maine Clean Election Act[1]

Title 21-A of the Maine Statutes entitled "Elections" governs campaign finance law for Maine elections. Chapter 13 governs "Campaign Reports and Finances." 21-A M.R.S.A. §§ 1001-1105. Chapter 14, also known as the "Maine Clean Election Act" ("MCEA"), makes public funding available for Maine gubernatorial, state senate, and state house candidates if they choose to participate in the program and accept its limitations. 21-A M.R.S.A. §§ 1121-1128.

[1] The history and intended purpose of the Maine Clean Election Act and campaign finance laws, as well as a full description of the relevant statutory framework, were laid out in significant detail by Judge Hornby and the First Circuit throughout the various *Daggett* decisions. See Daggett v. Webster, 74 F. Supp. 2d 53 (D. Me. 1999) ("Daggett I"); 81 F. Supp. 2d 128 (D. Me. 2000) ("Daggett II"); aff'd sub nom., Daggett v. Comm'n on Gov't Ethics & Election Practices, 205 F.3d 445 (1st Cir. 2000) ("Daggett"). In the interest of judicial economy, the Court directs interested readers to these prior decisions and does not repeat that extensive factual record here.

In 1996, Maine voters passed via referendum An Act to Reform Campaign Finance, creating the MCEA, id., and lowering the ceiling on campaign contributions, id. §§ 1015(1) & (2), 1056(1). Daggett, 205 F.3d at 450. Prior to the 2000 election when these changes to Maine's election law were to go into effect, a number of plaintiffs brought a facial and as-applied challenge, asserting that the MCEA and its public funding mechanism unconstitutionally coerced candidates to participate, and that the contribution limits infringed on the First Amendment rights of both candidates and donors. In two separate decisions, Judge Hornby upheld the constitutionality of the MCEA in its entirety, see Daggett I, 74 F. Supp. 2d at 55, 63-64, as well as the independent constitutionality of the reduced contribution limits for House and Senate candidates, see Daggett II, 81 F. Supp. 2d at 129, 139.[2] See also Daggett, 205 F.3d at 452 (summarizing the Daggett plaintiffs' constitutional challenges and the district court's holdings). On a consolidated appeal, the First Circuit affirmed these judgments, upholding the constitutionality of the challenged sections of Maine's campaign finance law. See Daggett, 205 F.3d at 450.

A decade has passed since MCEA and its matching funds provisions were first implemented. In 2008, three hundred and three (303) Maine legislative candidates—or roughly 81% of the total—participated in the public funding scheme;[3] $20,508.73 in matching funds were distributed to publicly funded candidates in the primary and $463,483.52 in matching funds were distributed to publicly funded candidates in the general election. (Compl. ¶16 & Ex. 1; see also Wayne Aff. ¶27.) In the spring of 2010, 280 candidates, involved in 170 different contested races for State Representative, State Senator and Governor, qualified for public funding under

---

[2] The district court dismissed the challenge to the limits on contributions by political parties due to lack of standing and the limits for gubernatorial candidates due to lack of both ripeness and standing. Id. at 129, 137-38.

[3] Of these, one hundred and fourteen (114) received matching funds. (Compl. ¶16 & Ex. 1.)

the MCEA. (See Wayne Aff. ¶35; Defs.' Resp. in Opp'n to Mot. to Consolidate (Docket # 19) at 1; List of All Candidates in Nov. 2010 Gen. Election (Docket # 28-9).) The 2010 elections will be held on November 2, 2010.

**B. The Current Plaintiffs**

The pending challenge is brought by three plaintiffs: one incumbent candidate, one non-profit political action committee and one contributor. Each has a different stake in the upcoming 2010 election and each potentially is subject to unique restrictions under Maine's campaign finance laws.

Plaintiff Representative Andre E. Cushing III is a traditionally-funded candidate currently running for re-election as the state representative for District 39. In 2008, Cushing ran as a traditionally-funded candidate and his spending triggered matching funds to his opponent. (Compl. ¶19.)[4] In this election cycle, Representative Cushing raised over $7,000 and spent $6,489 before the primary election in June, in which he was unopposed. In the upcoming November general election, he faces two opponents, one of whom is privately-financed and one of whom is participating in the MCEA program. As of August 26, 2010, Cushing had reported raising $4,179 for his general election campaign, of which he has spent $2,353. (see Joint Opp'n at 2; Wayne Aff. ¶¶43-44.) He avers that he imminently expects to receive additional contributions that will bring him to the "trigger threshold" of $4,656.00,[5] which will result in

[4] According to Defendants, in the primary election in 2008, Cushing beat two opponents, both of whom were MCEA candidates. During the primary, his fundraising activities triggered the maximum amount of matching funds for both opponents; however, he still outspent each of them by a ratio of roughly 2.7 to 1. In the 2008 general election, Cushing raised and spent nearly $12,000, whereas his opponent, who was a MCEA candidate, received an initial distribution of $4,144 in public funds plus $4,739 in matching funds and spent $8,885. (See Joint Opp'n at 2; Wayne Aff. ¶¶38-42.)

[5] Under 21-A M.R.S.A. § 1125(9), the minimum trigger amounts for matching funds are the same as the initial disbursement. In 2010, the initial disbursements for publicly funded candidates are $1,504 for the primary and $4,144 for the general election in contested state representative races, $7,746 for the primary and $19,078 for the general election in contested state senate races, and $400,000 for the primary and $600,000 for the general election

$300 in matching funds being issued to his MCEA opponent; he also states that he is currently "considering cancelling additional fundraising activities" in order to avoid triggering matching funds. (see Compl. ¶21; Cushing Decl. ¶¶3-5; Joint Opp'n at 2.)

Plaintiff Respect Maine PAC, of which Representative Cushing is the Chairman, is a non-profit political action committee organized in the State of Maine for the purpose of making independent expenditures, as defined by 21-A M.R.S.A. § 1019-B(1)(B), in support of or in opposition to Maine state legislative candidates. (Compl. ¶¶6, 22.) As such, it is subject to the reporting requirement of 21-A M.R.S.A. § 1019-B(3). The latest campaign finance report reveals that Respect Maine PAC has received only two contributions—$500 from Representative Cushing's own campaign committee and $1,500 from ME Truck PAC—and it has made only one expenditure of $264 for donor cards and envelopes. (See Joint Opp'n at 2-3; Wayne Aff. ¶ 46-47.) Plaintiff Respect Maine PAC avers that it "is certain" that it "will be forced to curtail its … independent expenditures supporting a traditionally funded candidate or opposing a publicly funded candidate in the 2010 election where the trigger amount has been or will be reached." (Compl. ¶23.)

Plaintiff Harold A. Clough is an individual residing in Scarborough, Maine. (Compl. ¶8.) Clough has made past contributions to support political candidates. Clough and his wife have each already made contributions of $750 to Paul LePage for Governor during the 2010 general election campaign season. (Compl. ¶28; see also Joint Opp'n at 3.) Clough wishes to make additional contributions to Paul LePage for Governor during the 2010 general election above the $750.00 limit contained in 21-A M.R.S.A. § 1015(1). (Compl. ¶28.)

---

in gubernatorial races. (See Compl. ¶17; Wayne Aff. ¶13.) Cushing's opponent who is participating in the MCEA program received the initial distribution of $4,144 in Clean Election funds for the general election. However, because his opponent had $512 left over from her primary election campaign, matching funds will not be triggered until Representative Cushing raises or spends more than $4,656 in his general election campaign. (See Joint Opp'n at 2; Wayne Aff. ¶¶ 43-44.)

## III. PROCEDURAL HISTORY

Plaintiffs filed their Verified Complaint (Docket # 1) on August 5, 2010, approximately two months after the primary election, and at least six months after 280 candidates indicated their intent to rely on the public funding program set out in MCEA. The Verified Complaint asserts that portions of Maine state law regulating elections and election campaigns—codified at 21-A M.R.S.A. §§ 1015(1), 1019-B(1)(B) & (3), and 1125(9)—violate the First and Fourteenth Amendments to the United States Constitution and seeks declaratory and injunctive relief.[6] The claims are stated in five separate counts.[7]

In Counts I and II, Plaintiffs bring facial and as-applied constitutional challenges to the independent expenditure reporting requirements in 21-A M.R.S.A. § 1019-B(3).[8] Specifically, in their Motions and in Count I they assert that the Court should apply strict scrutiny and conclude that Section 1019-B(3) violates the First Amendment because it: "coerc[es] involuntary participation in public campaign financing by punishing and burdening those entities . . . who intend to make independent expenditures over $100 supporting a traditionally funded candidate or opposing a publicly funded candidate;" and the burden imposed is "not narrowly tailored to

---

[6] Defendants, all residents of Maine, are members of the Commission on Governmental Ethics and Election Practices charged under 21-A M.R.S.A. §§ 1003 & 1127 with the enforcement of the provisions of Chapter 13 and 14, respectively, of Title 21-A; Attorney General Janet T. Mills, who is charged with enforcing Maine's election laws pursuant to 21-A M.R.S.A. §§ 33, 1003, & 1062-A; and District Attorneys throughout the State, who are charged with enforcing Maine's election laws pursuant to 21-A M.R.S.A. § 33, 30-A M.R.S.A. §§ 282-83.

[7] While it first appears that Plaintiffs have filed a six count complaint, there is no Count V included. (See Compl. at pp. 13-14) (skipping from Count IV to Count VI).

[8] 21-A M.R.S.A. § 1019-B(3) provides that "A person, party committee, political committee or political action committee that makes independent expenditures aggregating in excess of $100 during any one candidate's election shall file a report with the commission. In the case of a municipal election, a copy of the same information must be filed with the municipal clerk." An "independent expenditure," pursuant to 21-A M.R.S.A. § 1019-B(1)(B), "[i]s presumed in races involving a candidate who is certified as a Maine Clean Election Act candidate … to be any expenditure made to design, produce or disseminate a communication that names or depicts a clearly identified candidate and is disseminated during the … the 35 days, including election day, before a general election; or during a special election until and on election day."

serve an anticorruption interes[t] . . . and unconstitutionally includes issue advocacy." (Compl. ¶¶33-35; Mot. for PI at 14-15.)[9] In Count II, Plaintiffs assert that the same independent reporting requirement is overbroad and thereby unconstitutionally burdens the rights of free speech and association in violation of the First Amendment. (Compl. ¶¶39-41.)

In Count III, Plaintiffs challenge MCEA's matching funds provision as violative of the First and Fourteenth Amendments. This provision allows for supplemental grants of public funding, also referred to as "rescue funds," under certain circumstances. See 21-A M.R.S.A. § 1125(9).[10] Plaintiffs mount a four-prong challenge arguing that the matching funds provision (1) "treats speech differently depending on whether it opposes or favors a publicly funded candidate;" (2) is driven by the improper governmental purpose of "attempting to equalize the relative financial resources of candidates;" (3) creates a chilling effect on candidates' and contributors' speech because of the "knowledge that making an expenditure that opposes a publicly funded candidate or supports a traditionally funded one will directly result in that publicly funded candidate receiving a dollar-for-dollar matching public subsidy;" and (4) is a

[9] In Count I, Plaintiffs also assert that Section 1019-B's "48-hour rebuttal rule is 'patently unreasonable' and is not narrowly tailored." (Compl. ¶35; see also 21-A M.R.S.A. § 1019-B(2).) Section 1019-B(2) provides for a way to rebut the presumption that an independent expenditure has been made, but Judge Hornby recently severed this section from the statute. See Nat'l Org. for Marriage v. McKee, No. 09-cv-538-B-H, __ F. Supp. 2d __, 2010 WL 3270092, at *11 (D. Me. Aug. 19, 2010) ("Maine's statute treating statements about a clearly identified candidate in the limited period before an election is similarly justified, and there is no constitutional need to provide for a rebuttal to the presumption that it is an independent expenditure. I therefore sever the rebuttal provision."). In light of this ruling in the McKee case, the Court considers this argument effectively mooted.

[10] The Clean Election Act's matching funds provision reads as follows:

> When any report required under this chapter or chapter 13 shows that the sum of a candidate's expenditures or obligations, contributions and loans, or fund revenues received, whichever is greater, in conjunction with independent expenditures reported under section 1019-B, exceeds the sum of an opposing certified candidate's fund revenues, in conjunction with independent expenditures, the commission shall issue immediately to the opposing certified candidate an additional amount equivalent to the difference. Matching funds for certified candidates for the Legislature are limited to 2 times the amount originally distributed under subsection 8-A. Matching funds for certified gubernatorial candidates in a primary election are limited to half the amount originally distributed under subsection 8-A. Matching funds for certified gubernatorial candidates in a general election are limited to the amount originally distributed under subsection 8-A.

21-A M.R.S.A. § 1125(9).

"content-based regulation of speech opposing a funded candidate that is not narrowly drawn to serve a compelling interest." (Compl. ¶¶44-47.)

Finally, in Counts IV and VI, Plaintiffs claim that the $750.00 per-election contribution limit for gubernatorial candidates violates the First Amendment. Specifically, in Count IV, Plaintiffs argue that Maine's contribution limits, 21-A M.R.S.A. § 1015,[11] fail intermediate scrutiny because they are not "closely" drawn to the "sufficiently important interest" of "preventing corruption and the appearance of corruption." (Compl. ¶¶50-52; Mot. for PI at 18.) And, in Count VI, Plaintiffs assert that the state law's contribution limit is unconstitutionally low because it "burden[s] First Amendment interests in a manner that is disproportionate to the public purposes [it was] enacted to advance." (Compl. ¶¶55-56.)

Plaintiffs simultaneously filed a Motion for Preliminary Injunction (Docket # 4), asserting that Plaintiffs' rights under the First Amendment were already being violated and asking the Court to preliminary enjoin the distribution of MCEA matching funds to candidates running in the current election, the enforcement of MCEA's independent reporting requirements, and the enforcement of MCEA's $750 contribution limit for gubernatorial races based on the alleged constitutional violations. That same day, Plaintiffs also filed a Motion to Consolidate (Docket # 5) the hearing on the preliminary injunction with a trial on the merits, and a Motion to Expedite (Docket # 6).

Upon review of Plaintiffs' initial filings, the Court held a conference of counsel on August 12, 2010. At this conference, both parties indicated that the Court need not hold an evidentiary hearing on the requested PI because the factual record could be fully developed in

[11] Section 1015 provides in pertinent part that "[a]n individual may not make contributions to a candidate in support of the candidacy of one person aggregating more than $750 in any election for a gubernatorial candidate or more than $350 in any election for any other candidate." 21-A M.R.S.A. § 1015(1). The limit, increased by fifty percent one year ago, is indexed to inflation and adjusted every two years. (See Joint Opp'n at 8.)

affidavit form; the parties did, however, ask for oral argument on the Motion for PI. (See Report of Conference & Order (Docket # 15) at 2-3.) Based primarily on representations made by both parties at this Conference, the Court laid out a schedule for its consideration of the Motion for Preliminary Injunction that effectively addressed Plaintiffs' Motion to Expedite.[12] Shortly thereafter, the Court formally denied Plaintiffs' Motion to Expedite in the same Order in which it denied Plaintiffs' Motion to Consolidate. (See Order on Plaintiffs' Mot. to Consolidate (Docket # 21).)

Plaintiffs filed this pending TRO Motion on August 31, 2010 (Docket # 22). The TRO Motion reasserts essentially the exact same facts and arguments made in the pending PI Motion and requests the same relief. The sole addition is that Representative Cushing now provides specific facts indicating that, absent earlier Court intervention, $300 in matching funds definitively will be issued to his MCEA opponent prior to the oral argument on the Motion for PI currently scheduled for October 5, 2010. (See Mot. for TRO ¶4; Cushing Decl. ¶¶3-5.)

At the September 1, 2010 conference of counsel before Magistrate Judge Rich, both parties agreed that there was no need for an evidentiary hearing or oral argument on the requested TRO. (See Report of Hearing & Order (Docket # 25) at 2-3.)

## IV. DISCUSSION

### A. Standing and Ripeness

Plaintiffs' Complaint and the pending Motions for the most part do not specifically identify which of the three named Plaintiffs are advancing particular claims. As detailed below, the substance of the Complaint makes clear, however, that Respect Maine PAC is bringing the challenge to the independent expenditure reporting requirements contained in Counts I and II;

[12] Specifically, the Court ordered for the Defendants' Response to be submitted by September 10, 2010, for the Reply to be submitted by September 17, 2010 and for oral argument to be scheduled for October 5, 2010.

Representative Cushing and Respect Maine PAC are asserting the challenge to the matching funds provision contained in Count III; and Harold Clough is challenging the contribution limit for gubernatorial candidates contained in Counts IV and VI.

Defendants appear to concede that Representative Cushing and Respect Maine PAC have standing to challenge the constitutionality of Maine's framework for providing supplemental grants of public funds to certain candidates, the claim contained in Count III.

Defendants do, however, assert that Respect Maine PAC lacks standing to bring its claim that independent expenditure reporting requirements in 21-A M.R.S.A. § 1019-B(3) violate the First Amendment (Counts I and II). Specifically, Defendants point to the fact that the PAC has only raised $2,000 and argue that the Complaint fails to indentify concrete plans to make any independent expenditures likely to trigger supplemental funds to a publicly-funded candidate.

The Court disagrees. "To establish standing under Article III of the U.S. Constitution, plaintiffs must allege personal injury fairly traceable to the defendant[s'] allegedly unlawful conduct and likely to be redressed by the requested relief." Bingham v. Massachusetts, No. 09-2049, __ F.3d __, 2010 WL 2978141, at *3 (1st Cir. July 30, 2010) (quoting Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 598 (2007)) (internal quotation marks omitted). Plaintiffs must show that they have "sustained or [are] immediately in danger of sustaining some direct injury ... [that is] both real and immediate." McKee, 2010 WL 3270092 at *6 (citing Ramirez v. Ramos, 438 F.3d 92, 98-99 (1st Cir. 2006)). "Prudential standing concerns are 'relaxed' where the First Amendment is concerned, but constitutional standing requirements are not eliminated." McKee, 2010 WL 3270092 at *3 & n.89. "When plaintiffs are 'chilled' from exercising First Amendment rights out of fear of 'enforcement consequences,' they need not wait for actual harm before seeking relief." Nat'l Org. for Marriage v. McKee, 666 F. Supp. 2d 193,

202 (D. Me. 2009). Here, Respect Maine PAC's injury is not mere conjecture—rather, the Verified Complaint states that the PAC will curtail making these intended independent expenditures in order to avoid triggering matching funds during this election cycle. (See Compl. ¶23.) By identifying with some specificity an intent to make contributions and expenditures that presently is being compromised, Respect Maine PAC has provided the requisite real and personal injury and has standing to bring Counts I and II.

Defendants likewise assert that Mr. Clough lacks standing and that his challenge to the gubernatorial limit is not justiciable because Courts IV and VI do not identify a "case or controversy" giving federal jurisdiction over their constitutional challenges. Specifically, Defendants point to the fact that there is no plaintiff in this action who intends to run for governor, and therefore no one who can claim injury by direct application of the $750 contribution limit.

Once again, the Court disagrees. "Justiciability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention." Renne v. Geary, 501 U.S. 312, 320 (1991). In Daggett, the First Circuit agreed with this Court's dismissal without prejudice of the plaintiffs' challenge to the limits on contributions to gubernatorial candidates on the ground that none of the parties had standing to challenge this particular limit. See Daggett, 205 F.3d at 462. In Daggett, there was not going to be a gubernatorial election for another two years, "[n]one of the appellant candidates claim[ed] to be a candidate for governor in 2002, and none of the appellant donors claim that they would give more than $500 to an identifiable gubernatorial candidate but for the contribution limits." Id. By contrast, here the next election for gubernatorial, state and house candidates will occur on November 2, 2010. Plaintiff Clough asserts that the prospective enforcement of Maine law

prevents him from contributing any additional money to a specific candidate's 2010 gubernatorial campaign, thereby giving him a direct stake in the outcome of the litigation.[13]

**B. The Likelihood of Success on the Merits**

Having determined that Plaintiffs have standing and present justiciable claims, the Court turns its attention to Plaintiffs' request for immediate injunctive relief. The Court has already indicated that the traditional four-factor test applies. "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996) (describing the "likelihood of success" as the "main bearing wall of the four-factor framework"). This is particularly true in First Amendment cases, where the four-part test ends up being "something of a formality . . . given the clear irreparable harm caused by censorship, the hardship that censorship imposes on citizens, and the strong public interest in upholding constitutional rights." McKee, 2010 WL 3270092 at *3 & n.55 (citing Asociación de Educación Privada de P.R., Inc. v. García-Padilla, 490 F.3d 1, 21 (1st Cir. 2007) (noting that the loss of First Amendment freedoms "unquestionably constitutes irreparable injury") (citation omitted)).

Here, the Court is not writing on a clean slate. All of the same arguments currently raised by Plaintiffs in their Verified Complaint were raised, and ultimately rejected, in Daggett v. Commission on Governmental Ethics & Election Practices, 205 F.3d 445 (1st Cir. 2000).[14]

---

[13] Similarly, the Daggett case involved both plaintiffs who were legislative candidates in the 2000 election and political action committees that intended to contribute to legislative campaigns in the 2000 election. The First Circuit reached the question of whether contribution limits for legislative candidates contained in the same statutory subsection were constitutionally sound, concluding that these limits on contribution did not burden the contributor's free speech, the candidate's free speech, or the freedom of association. See id. at 453-62.

[14] More specifically, the First Circuit held that: (1) the campaign contribution limits of $250 for state legislative candidates by individuals, groups or associations (including political parties) did not unconstitutionally infringe

Specifically with regard to MCEA's matching funds provision, the Daggett Court determined that this public funding scheme "in no way limits the quantity of speech one can engage in or the amount of money one can spend engaging in political speech, nor does it threaten censure or penalty for such expenditures." Id. at 464 (relying on Buckley v. Valeo, 424 U.S. 1 (1976)). Accordingly, the First Circuit "comfortably … conclude[d] that the provision of matching funds based on independent expenditures does not create a burden on speakers' First Amendment rights." Id.

In 2008, the United States Supreme Court decided Davis v. Federal Election Commission, 128 S. Ct. 2759 (2008). The Davis case involved the so-called "Millionaire's Amendment" to the Bipartisan Campaign Reform Act, which provided that "when a candidate spends more than $350,000 in personal funds and creates what the statute apparently regards as a financial imbalance, that candidate's opponent may qualify to receive both larger individual contributions than would otherwise be allowed and unlimited coordinated party expenditures." Davis, 128 S. Ct. at 2770. The Davis Court held that the "scheme impermissibly burdens [the] First Amendment right to spend [one's] own money for campaign speech," because "it imposes an unprecedented penalty on any candidate who robustly exercises that First Amendment right [by requiring] a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations." Id. at 2771.

---

upon First Amendment rights of candidates and donors, because, *inter alia*, the evidentiary showing of corruption or its appearance was sufficient to establish Maine's interest in enacting the law to warrant the potential infringement on the freedom of association by the contribution ceilings, the limits were sufficiently closely drawn, and the statute was not overbroad, id. at 453-62; (2) MCEA's provision granting matching funds based on independent expenditures favoring candidates not participating in the public campaign financing scheme did not violate the First Amendment because the provision does not indirectly burden contributors' speech and associational rights, id. at 463-65; (3) independent expenditures disclosure requirement was constitutional, id. at 465-66; and (4) MCEA's public campaign financing scheme, including its matching funds provision, did not burden the First Amendment rights of candidates or contributors because, *inter alia*, "a non-participating candidate retains the ability to outraise and outspend her participating opponent with abandon … and holds the key as to how much and at what time the participant receives matching funds," and it "provides a roughly proportionate mix of benefits and detriments to candidates seeking public funding, such that it does not burden the First Amendment rights of candidates or contributors," id. at 466-472.

In Plaintiffs' view, Davis calls into question the constitutionality of Maine's publicly funded matching funds scheme and, thus, should cause this Court to reassess the continued vitality of Daggett. In so arguing, Plaintiffs rely heavily on two very recent decisions from the Second and Eleventh circuits that have invalidated state matching funds and independent expenditure provisions based largely on the Davis analysis. See Green Party of Conn. v. Garfield, Nos. 09-3760-cv(L), 09-3941-cv)CON), __ F.3d __, 2010 WL 2737153 (2d Cir. July 13, 2010); Scott v. Roberts, 612 F.3d 1279 (11th Cir. 2010).[15] Plaintiffs also argue that the recent Supreme Court decision in Citizens United v. Federal Election Commission, 130 S. Ct. 876, 909 (2010) establishes that "[i]ndependent expenditures, however, are not corrupting." (Motion for PI at 16.).

Despite these interesting developments in other circuits, the First Circuit's holding in Daggett remains binding on this Court under the doctrine of *stare decisis*.[16] "Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." Eulitt v. Department of Education, 386 F.3d 344, 349 (1st Cir. 2004); see also Crowe v. Bolduc, 365 F.3d 86, 94 (1st Cir. 2004) (noting that district court correctly regarded circuit precedent as "good

[15] Plaintiffs also point to McComish v. Brewer, a public matching funds challenge filed in the District of Arizona. See McComish v. Brewer, No. CV-08-1550, 2010 WL 2292213 (D. Ariz. Jan. 20, 2010) (finding public matching funds to be unconstitutional). This decision was subsequently appealed to the Ninth Circuit, which reversed the district court decision concluding that the Davis analysis was not dispositive. See McComish v. Bennett, 611 F.3d 510 (9th Cir. 2010). Shortly thereafter, the Supreme Court issued a stay of the Ninth Circuit's decision in McComish thereby allowing for the filing of a petition for writ of certiorari on August 17, 2010. The Supreme Court's stay remains in effect pending a decision on this petition.

[16] "As a general matter, the doctrine of *stare decisis* precludes the relitigation of legal issues that have previously been heard and authoritatively determined. In other words, *stare decisis* renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision." Eulitt v. Dep't of Educ., 386 F.3d 344, 348 (1st Cir. 2004) (internal punctuation and citations omitted). Like the similar "law of the circuit rule," the deference required by *stare decisis* is not only important, "[i]t is one of the building blocks on which the federal judicial system rests." San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. July 15, 2010) (noting that the "law of the circuit" rule also "promotes important virtues, including humility, stability, and predictability of outcomes within a judicial circuit").

law" even though a subsequent Supreme Court dictum had "presaged the demise" of the rule stated therein). The Court is not convinced that Davis and/or Citizens United cast Daggett into disrepute or otherwise reflect an overruling of Daggett.[17]

Thus, a "cautious approach" demands that this Court's discussion of the merits begin and end with Daggett in which the First Circuit authoritatively answered exactly the same questions Plaintiffs now urge this Court to decide.[18] Eulitt, 386 F.3d at 349; see also Sarzen v. Gaughan, 489 F.2d 1076, 1082 (1st Cir. 1973) (explaining that *stare decisis* requires lower courts to take binding pronouncements "at face value until formally altered"). Based on the application of *stare decisis* and the existing precedent, the Court concludes Plaintiffs have no chance of success on the merits.

## V. CONCLUSION

On this basis, the Court hereby DENIES Plaintiffs' Motion for Temporary Restraining Order (Docket # 22).

---

[17] At the very least, Davis is factually distinguishable from the case currently before this Court. Cf. Daggett, 205 F.3d at 469 ("No two public funding schemes are identical, and thus no two evaluations of such systems are alike.") The claim in Davis was that a self-financed candidate's First Amendment rights were violated because his spending triggered an "asymmetrical regulatory scheme" or differential contribution limits. By contrast, Representative Cushing, the only candidate plaintiff, has indicated that it is not the expenditure of his own personal funds, but the receipt and expenditure of campaign contributions, that will trigger matching funds to his Clean Election opponent—who faces additional finance restrictions not faced by Cushing due to her choice to become a MCEA candidate. (Cushing Decl. ¶3.) See also Scott, 612 F.3d at 1281 (involving a constitutional challenge by millionaire plaintiff prevented from making personal expenditures by Florida's public funding scheme) (invalidating Fla. Stat. § 106.355); McComish, 611 F.3d at 521 ("Davis says nothing about public funding schemes … ."); *Public Financing After Davis: The Reports of My Death Are Greatly Exaggerated* (July 23, 2008), *available at* http://www.clcblog.org/blog_item-239.html (last visited Sept. 15, 2010) ("Comparing a system in which candidates start under the same rules (e.g., the Millionaire's Amendment system) to a system in which candidates start under different rules (e.g., a public financing system) is comparing apples to oranges.").

[18] As stated above, the Daggett court agreed with Judge Hornby that the plaintiffs lacked standing to challenge campaign contribution limits for gubernatorial candidates, Daggett, 205 F.3d at 462-63. As indicated earlier in this Order, the Court has found that Plaintiff Clough has standing to challenge these limits in connection with the 2010 gubernatorial election. However, this Court sees no reason as to why the Daggett Court's analysis and conclusion that the campaign contribution limits for legislative candidates did not burden the First Amendment rights of a contributor does not apply with equal weight to Plaintiff Clough's similar claims in Counts IV and VI. See Daggett, 205 F.3d at 459.

In the interest of handling this matter as expeditiously as possible and with the consent of the parties, the Court has issued this Order as to the TRO based on its review of the papers. Oral argument on the Motion for Preliminary Injunction remains tentatively set for October 5, 2010.

Because the Motion for Preliminary Injunction presents precisely the same arguments, the Court currently has no reason to expect that its analysis—and the outcome—will be any different. However, the Court is willing to hold the previously scheduled oral argument, which was requested by the parties, before issuing a decision on the Motion for PI. If the parties believe oral argument is no longer necessary, they shall inform the Clerk as soon as possible. Upon indication that neither side requests oral argument, the Court would issue a decision on the Motion for PI that is substantially similar to the decision now being rendered on the Motion for TRO.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 15th day of September, 2010.